646 F.2d 825
 25 Fair Empl.Prac.Cas. 803,
25 Empl. Prac. Dec. P 31,729
Dr. Saul LEVINE, Appellant,
v.
FAIRLEIGH DICKINSON UNIVERSITY, a non-profit corporation of
the State of New Jersey, Appellee.
 No. 80-1932.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 4, 1980.
Decided April 16, 1981.
As Amended May 18, 1981.
 
 Marc S. Friedman, Kalb, Friedman & Siegelbaum, Newark, N. J., Joseph D. Luksch (argued), Michael R. Zeller, James M. Donegan, Vedder, Price, Kaufman, Kammholz & Day, New York City, for appellant.
 Ronald H. DeMaria (argued), Lum, Biunno & Tompkins, Newark, N. J., for appellee.
 Before ADAMS, GARTH and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 I.
 
 1
 Dr. Saul Levine, formerly a professor at Fairleigh Dickinson University, and plaintiff below, appeals from an order granting the University's motion for summary judgment in a suit brought under the Age Discrimination in Employment Act, as amended, 29 U.S.C. §§ 621-634 (1976 & Supp. III 1979) (ADEA). Dr. Levine alleged the ADEA was violated when his nontenured appointment was reduced in May 1979 from full-time to part-time solely on the basis of his age, then 66. The district court concluded that Dr. Levine was not then an employee covered by the Act because he had "retired" from the University in June 1978 when his tenure was revoked. We conclude that Dr. Levine was in fact an employee covered by the ADEA on the relevant date and that the exemption covering faculty members under a contract of unlimited tenure is inapplicable in this case.II.
 
 
 2
 Prior to 1978, Dr. Levine was a tenured professor on the faculty of Fairleigh Dickinson University. The employment relationship between the faculty and the University was governed at that time by a contract between the University and the Fairleigh Dickinson University Council of American Association of University Professors Chapters, the certified labor organization representing the full-time faculty at the University.[1] Under the contract, faculty members were required to relinquish their tenured status at the end of the academic year in which they became 65 years old. The contract provided that a faculty member whose tenure had thus been removed might nonetheless be appointed to a nontenured, full-time position for a one-year period, and, after that one-year appointment had expired, might be appointed to a nontenured part-time teaching period during the academic years in which he or she reached 67 and 68. To receive either of these types of nontenured appointments, the individual was required to meet a standard of a continuing high level of teaching effectiveness and academic specialization in an area needed by the department and justified by student enrollment.[2]
 
 
 3
 Dr. Levine reached the age of 65 in December 1977 and, pursuant to the contract, his tenure was revoked at the end of that academic year in June 1978 and he was then appointed to a one-year full-time position for 1978-79. He held this full-time nontenured appointment on January 1, 1979, the effective date of the amendments to the ADEA of 1967. Those amendments, inter alia, extended the scope of that statute, which previously applied to persons ages 40 to 65, to protect persons up to 70 years of age against age discrimination. Age Discrimination in Employment Act Amendments of 1978, Pub.L.No.95-256, § 3(a), 92 Stat. 189, codified at 29 U.S.C. § 631(a) (Supp. III 1979). In May 1979, however, the University refused to continue Dr. Levine in his then full-time nontenured status and he was informed that he would receive only a part-time faculty appointment for the 1979-80 academic year.
 
 
 4
 Dr. Levine commenced the present action against the University in December 1979. He alleged that the University's refusal to appoint him to a full-time position for the 1979-80 academic year was a decision based solely on a contractual provision that discriminated explicitly on the basis of age and that there was no applicable statutory exemption. He requested injunctive relief, back pay and damages.
 
 
 5
 Since the facts were not in dispute, Dr. Levine moved for summary judgment against the University which made a cross-motion for summary judgment.[3] Following a hearing, the district court ruled in an oral opinion that Dr. Levine had retired prior to the effective date of the ADEA amendments, and it denied Dr. Levine's motion and granted summary judgment to the University.[4]
 
 III.
 
 6
 Section 4(a) of the ADEA, 29 U.S.C. § 623(a) (1976), makes it unlawful for an employer
 
 
 7
 (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (or)
 
 
 8
 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age "
 
 
 9
 Dr. Levine and the University agree that Dr. Levine's position was reduced from full-time to part-time in May 1979 solely on the basis of his age. An involuntary reduction of teaching load, with its concomitant reduction in pay, based solely on age patently falls within the statutory proscription. The University however argues that Dr. Levine retired at the close of the 1977-78 academic year before the statutory amendments became effective and that Dr. Levine was no longer an employee under the protection of the ADEA on January 1, 1979 (the effective date of the amendments). The University characterizes its retirement policy as one that "in effect allowed (Dr. Levine) to phase out his actual teaching over three years" after June 1978. Brief for Appellee at 15.
 
 
 10
 The issue is clearly defined: Was Dr. Levine "employed" by the University on January 1, 1979 so that he was protected by the amendments to the ADEA which came into effect on that day and extended the Act's coverage to include individuals up to seventy years of age? Section 4(a) of the ADEA, 29 U.S.C. § 623(a) (1976), prohibits age discrimination by employers against employees and applicants for employment. The University candidly concedes Dr. Levine was employed by it on January 1, 1979, but contends he was employed in a retirement status. The Act makes no provision for a separate status of employment. The statutory definition of "employee" is not so limited and states that "(t)he term 'employee' means an individual employed by any employer " 29 U.S.C. § 630(f) (1976).[5] This broad language accords with the congressional intent to prohibit employment discrimination against "any individual" in an employment relationship with an employer of the type defined in the Act. 29 U.S.C. § 623(a) (1976). See also id. § 621 (statement of findings and purpose). The University does not dispute that it is such an employer.
 
 
 11
 Dr. Levine's relationship with the University on January 1, 1979 had the characteristic features of employment. The relationship was the subject of a separate letter agreement between Dr. Levine and the University signed in the spring of 1978 which obligated Dr. Levine to perform specified services for the University; he was paid according to the services he rendered for the period of the contract. He received no retirement benefits for the same period but in fact continued to contribute to the retirement plan as any other employee of the University did. Pursuant to the collective bargaining agreement with the Council, his appointment to this one-year term was required to follow "the normal faculty status processes." Given these facts, we see no basis to accept the University's contention that Dr. Levine was no longer an employee for purposes of the ADEA just because he lost his tenure in 1978. Had the University actually retired Dr. Levine in 1978 when he reached the age of 65 by severing both his services and his compensation for current employment, then Dr. Levine would have no grounds for complaint under the ADEA which at that time did not protect employees beyond the age of 65. The mere fact that the amendments had been enacted before the loss of his tenure would not have given Dr. Levine any additional rights because the extended age provision of these amendments did not become operative until January 1, 1979. See Kuhar v. Greensburg-Salem School District, 616 F.2d 676 (3d Cir. 1980). But the University did not sever its relationship with Dr. Levine in mid-1978. Instead, it continued that relationship, albeit somewhat altered by a change in title and the loss of tenure, by continuing the essence of an employment relationship the exchange of services for pay. Therefore, the University cannot avoid its obligations under the ADEA by the simple formula of labeling an employee as retired.
 
 
 12
 The only reason given by the district court for its holding that Dr. Levine was not an employee within the ADEA was an analogy drawn between Dr. Levine's position and that of a "retired" federal judge. We find the comparison inapposite. Federal judges and other federal employees are not covered by the general provisions of the ADEA. 29 U.S.C. § 630(b) (1976). The statute which prohibits age discrimination against federal employees is inapplicable to the federal judiciary. See 29 U.S.C. § 633a (Supp. III 1979). Because of the constitutional guarantee of life tenure for federal judges with undiminished salary, U.S.Const. art. III § 1, the position of senior status federal judges cannot be analogized to Dr. Levine's situation.
 
 
 13
 Although this appears to be a case of first impression, we believe there is an appropriate analogy to be drawn from the status under the labor laws of employees labeled as "retired" but who continue in the employment relationship. In Allied Chemical & Alkali Workers, Local No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), the Supreme Court held that the employer had no obligation under the National Labor Relations Act to bargain over retired employees because the statute imposes a duty to bargain only with respect to "employees" and "(t)he ordinary meaning of 'employee' does not include retired workers; retired employees have ceased to work for another for hire." Id. at 168, 92 S.Ct. at 392 (emphasis added). Justice Brennan, writing for the court quoted approvingly from the Sixth Circuit's decision under review, id. at 165, 92 S.Ct. at 390, where the court described retirement as follows:
 
 
 14
 Retirement with this Company, as with most other companies, is a complete and final severance of employment. Upon retirement, employees are completely removed from the payroll and seniority lists, and thereafter they perform no services for the employer, are paid no wages, are under no restrictions as to other employment or activities, and have no rights or expectations of re-employment.
 
 
 15
 Pittsburgh Plate Glass Co. v. NLRB, 427 F.2d 936, 944 (6th Cir. 1970). The NLRB has consistently held that notwithstanding their label of professors emeriti, those faculty members who actively engage in teaching or research are to be distinguished from those who are truly retired, and therefore must be included in bargaining units with other faculty members. University of Vermont, 223 N.L.R.B. 423, 427 (1976); Rensselaer Polytechnic Institute, 218 N.L.R.B. 1435, 1438 (1975); Tusculum College, 199 N.L.R.B. 28, 32 (1972). In fact, Dr. Levine claims that the very collective bargaining agreement in this case includes in the bargaining unit those individuals who, like Dr. Levine in 1978-79, are teaching full-time notwithstanding their "retired" status.[6]
 
 
 16
 Accordingly, we find nothing in the record to support the district court's conclusion that Dr. Levine was not an employee of the University when the amendments to the ADEA took effect on January 1, 1979 since he was then teaching full-time and being compensated accordingly.
 
 IV.
 
 17
 The University argues alternatively that the reduction of Dr. Levine's courseload falls within the exemption provided in the ADEA for compulsory retirement of individuals who are less than seventy years of age but who are under contracts of unlimited tenure. Section 12(d) of the ADEA, 29 U.S.C. § 631(d) (Supp. III 1979), states:
 
 
 18
 Nothing in this Act shall be construed to prohibit compulsory retirement of any employee who has attained 65 years of age but not 70 years of age, and who is serving under a contract of unlimited tenure (or similar arrangement providing for unlimited tenure) at an institution of higher education (as defined by section 1201(a) of the Higher Education Act of 1965).
 
 
 19
 According to the University, Dr. Levine was teaching after January 1, 1979 "solely because" of the retirement plan, which provided for loss of tenure prior to "the post-retirement phase down years." The University points out that the enforced loss of tenure opened a tenure position for a new appointment, and the subsequent reduction of his teaching load also reduced the University's costs. These results, asserts the University, further the purpose of Congress in enacting the exemption, and it argues that Dr. Levine's situation should therefore be regarded as within the exemption.
 
 
 20
 The legislative history gives three rationales for the tenured faculty exemption: to open positions for younger professors; relieve the financial burden caused by the retention of highly paid senior employees; and avoid the difficulty of obtaining the objective assessments of individual performances necessary to discharge tenured faculty for cause.[7] In exempting only those persons under contracts of unlimited tenure and in providing that the exemption would be repealed on July 1, 1982,[8] Congress established a narrow exception. This limited scope was repeatedly emphasized in the floor debate passage of the tenure exemption. Senator Chafee, author of the provision, emphasized the unique nature of university tenure and the inertia it produced, pointing out that the bill left open the possibility that a college might choose to extend a professor's contract past age sixty-five. 123 Cong.Rec. 34308 (1977). Co-sponsors of the bill, including Senators Javits and Moynihan, distinguished the problem of university tenure from that of tenured public school and secondary school teachers, and stressed that the exemption contemplated by Congress was restricted to the former. Id. at 34312. See id. 34314-15 (remarks of Senator Javits, stating that he accepts the amendment as a co-sponsor of the bill only because of its narrow reach).
 
 
 21
 This intent of Congress to construct only a very narrow exemption to the general prohibition against age discrimination is carried out in the regulations promulgated pursuant to the 1978 amendments by the Equal Employment Opportunity Commission.[9] As interpreted by the EEOC, the tenure exemption allows an educational institution not only to forcibly retire a faculty member at age 65 but also to reduce a tenured faculty member to a part-time or nontenured appointment. The EEOC emphasized, however, that the exemption does not license discrimination subsequent to such a reduction. The reduction is proper only "Provided, (t)hat the employee voluntarily accepts this new position or status", and that he or she is not treated any "less favorably, on account of age, than any similarly situated younger employees " 29 C.F.R. § 1625.11(g) (1980).[10]
 
 
 22
 When this interpretive regulation was originally proposed, it had been suggested by several commenters that the regulation be modified to provide that an individual within the tenure exemption who voluntarily accepts a nontenured position could thereafter be forced to retire on the basis of age. The EEOC rejected this suggestion, stating, "While the exemption does not require an institution of higher education to offer an employee a nontenured position or status in lieu of compulsory retirement, neither does it permit discrimination on the basis of age against an employee who accepts such employment from the institution." 44 Fed.Reg. 66793 (1979).
 
 
 23
 When presented with a problem of statutory construction, we must give deference to the interpretation given the statute by the officers or agency charged with its administration, unless the interpretive regulation can be said not to be a reasoned and supportable interpretation of the statute. Whirlpool Corp. v. Marshall, 445 U.S. 1, 11, 100 S.Ct. 883, 890, 63 L.Ed.2d 154 (1980). In light of the language and legislative history of the tenure exemption, we cannot say that the EEOC is unreasonable in interpreting the tenure exemption as inapplicable to individuals holding nontenured appointments after loss of tenure. Once a faculty member has given up tenured status, there exists a position into which a younger professor may move without the onerous process of finding just cause for his or her predecessor's discharge. Thus, at least two of the congressional concerns have been alleviated by Dr. Levine's movement from tenured to nontenured status because a new position has become available and Dr. Levine could be terminated more easily than when he held tenure.[11] If Dr. Levine's continued employment is not supported by "evidence of his continuing high level of teaching effectiveness and of his academic specialization in an area needed by his department and justified by student enrollment," the collective bargaining agreement allowed the University to elect not to continue to employ him. Even if such evidence is available, the agreement stated only that the University may employ him, not that it must. The University, however, chose to exercise that discretion to employ him. Having done so, it cannot thereby transform a nontenured appointment to a tenured one.
 
 
 24
 The University argues that Dr. Levine falls within the spirit of the tenured faculty exemption, if not within its letter. It argues that an interpretation which would find the tenure exception inapplicable would not be within the intention of its makers. However, we are not free to rewrite the language of a clear and unambiguous statute. There is no statutory interstice in this aspect of the ADEA which we are obliged to fill. See Glus v. G. C. Murphy Co., 629 F.2d 248, 263-64 (3d Cir.) (dissenting opinion), petition for cert. filed, 49 U.S.L.W. 3252 (U.S. Sept. 22, 1980) (No. 80-461).
 
 
 25
 Furthermore, the University points to no language in the legislative history which would show that Congress intended the tenured faculty exception to apply to previously tenured faculty members who have been retained in some other employment status by the University. Congress might have decided this issue in the manner sought by the University. On the other hand, it might have decided that the tenure status was the quid pro quo for the exception and, in its absence, the University should not be free to discriminate on the basis of age.
 
 
 26
 On the conceded facts on this record, Dr. Levine does not have the protection of tenure. He has no assurance of continuous academic employment. When he is considered for another one-year appointment, the University may reevaluate its need for his services in light of his ability, the demand for the courses he might teach, and his department's ability to satisfy its needs in his area of specialization by other means. Thus, the University may not rely on the statutory exception for tenured employees in defending its action in reducing Dr. Levine's workload and compensation on the basis of his age.
 
 V.
 
 27
 The University makes several additional suggestions which do not require extended discussion. It has argued that it acted in good faith in taking this action, and that it drew the line in a fair and reasonable manner. It points to its acceptance of a new collective bargaining agreement which permits faculty members to retain their positions until age 70, thereby accelerating the date when that requirement will be mandated by the ADEA.[12] The University's good faith is not an issue on liability because the statute contains no general good faith exception.[13]
 
 
 28
 The University also argues that it was following the provisions of a negotiated collective bargaining agreement when it reduced Dr. Levine's status from full-time to part-time on the basis of his age. The ADEA applies to labor unions as well as employees, and prohibits unions from promoting violation of the ADEA by an employer. 29 U.S.C. § 623(c) (1976). In the absence of any applicable exception for such agreements,[14] the statute's prohibition of age discrimination in employment takes precedence over a collective bargaining agreement.
 
 
 29
 We are not insensitive to the difficult position in which the University finds itself by the interaction of its post-tenure employment practices with the language of the ADEA. However, at the expiration of Dr. Levine's tenured status at the close of the 1977-78 academic year, the 1978 amendment to the ADEA had already been enacted. Thus, the University was on notice that wide-ranging changes would soon affect many employment practices of employers, including universities, throughout the country. It could have chosen the practice followed by other universities of completely severing the employment relationship with its faculty members when they lose their tenured status. As Dr. Levine's counsel concedes, the University was under no obligation to rehire Dr. Levine at the crucial time, because that would have given prospective application to the subsequently effective amendments. The language of the statute gave the University no basis for believing that if it entered into an employment relationship with those same faculty members, it could thereafter discriminate on the basis of age. Thus, if Dr. Levine falls within a crack in the statute, he does so on the basis of explicit statutory provisions, which only Congress is free to revise.
 
 VI.
 
 30
 Dr. Levine asks us to direct the entry of summary judgment in his behalf. We decline to do so. Although there is precedent for the proposition that when cross-motions for summary judgment have been filed, each party concedes the case is ready for disposition without further proceedings, we believe this is an inappropriate case for application of that rule. See Rains v. Cascade Industries, Inc., 402 F.2d 241, 245 (3d Cir. 1968). The motions for summary judgment were filed before the University filed its answer to the complaint and raised only legal grounds on the basis of undisputed facts. Under the circumstances, the University should not be deprived of its opportunity to raise other defenses when it files its answer.[15]
 
 
 31
 Accordingly, we will vacate the order of the district court granting the University's motion for summary judgment, and remand for further proceedings consistent with this opinion. Costs are to be taxed against the appellee.
 
 
 
 [1]
 The contract between the University and the Council for the academic year 1976-77 was extended by special agreement in October 1977 in order to allow time for negotiation of a new contract. That contract, executed April 7, 1978, was retroactive to September 1, 1977 and remained in effect through August 31, 1979. The contracts contained parallel provisions with regard to revocation of tenure and subsequent nontenured appointments. They differed only in that the later contract allowed for six rather than three contact hours in all part-time appointments
 
 
 [2]
 Sections 8.25(a) & (b) of the contract, effective September 1, 1977, provide as follows:
 
 
 [8]
 25 Retirement
 (a) The retirement year shall be that fiscal year (July 1 June 30) in which the member attains the age of 65. In the academic year following his retirement year, he shall be designated by his most recently held academic rank followed by "Retired" or, subject to Paragraph 8.23(c), he shall be awarded the title "Professor Emeritus." The designation "Professor Emeritus" or "Retired" shall not be intended to waive the retirement age of 65.
 (b) A "Retired" faculty member or "Professor Emeritus" achieving this status during the term of this Agreement may be called upon to serve an additional one-year appointment if there is evidence of his continuing high level of teaching effectiveness and of his academic specialization in an area needed by his department and justified by student enrollment.
 The appointment of such faculty members to such one-year term of service shall be decided upon through the normal faculty status processes of Articles 10 and 11.
 
 
 [3]
 Dr. Levine's complaint alleges he has complied with all of the procedural prerequisites of the ADEA, and the University has not argued to the contrary
 
 
 [4]
 Dr. Levine's suit was consolidated with a prior action filed by the University against the Council and several individuals, including Dr. Levine. As a result of the district court's decision with regard to Dr. Levine, there were no remaining unresolved questions in the suit by the University. The remaining parties to that suit have entered a Consent Order by which the University agreed to a voluntary dismissal
 
 
 [5]
 The definition excludes from coverage certain types of employees not relevant here
 
 
 [6]
 The complete collective bargaining agreement is not in the record, but the University has not disputed this contention which was made in appellant's brief
 
 
 [7]
 The Report of the Senate Committee on Human Resources states:
 Many colleges and universities maintain that for the foreseeable future the number of available faculty positions will be closely related to the number of retirements, thereby making it difficult to employ younger professors, particularly women and minorities. Moreover, the financial burden on already hard-pressed institutions of higher learning may be increased by this legislation, because it may require the retention of highly paid senior employees for additional years.
 Concerns were expressed by the committee that although it is theoretically possible to discharge tenured faculty for cause, the difficulty of objectively evaluating the performance of such employee(s) makes such good cause discharges difficult. The committee therefore adopted an amendment offered by Senator Chafee to permit colleges and universities to maintain compulsory retirement policies for faculty at age 65 or above who are serving under a contract of unlimited tenure or similar arrangement providing for unlimited tenure.
 S.Rep.No.493, 95th Cong., 1st Sess. 8-9 (1977), reprinted in (1978) U.S.Code Cong. & Ad.News 504, 511-12.
 
 
 [8]
 Age Discrimination in Employment Act Amendments of 1978, Pub.L.No.95-256, § 3(b)(3), 92 Stat. 190
 
 
 [9]
 Enforcement responsibility for the ADEA was originally given to the Department of Labor, which promulgated proposed regulations interpreting the tenure exemption on December 12, 1978. 43 Fed.Reg. 58154 (1978). Enforcement responsibility was transferred to the Equal Employment Opportunity Commission on July 1, 1979. Reorg. Plan No. 1 of 1978, 3 C.F.R. 321 (1979 Compilation). The EEOC was therefore the agency that published the final interpretations of the tenure exemption on November 21, 1979. 44 Fed.Reg. 66791 (1979)
 
 
 [10]
 The relevant administrative regulation also provides:
 Since section 12(d) is an exemption from the nondiscrimination requirements of the Act, the burden is on the one seeking to invoke the exemption to show that every element has been clearly and unmistakably met. Moreover, as with other exemptions from the ADEA, this exemption must be narrowly construed.
 
 
 [29]
 CFR § 1625.11(b)
 The Department of Labor's proposed regulation was a matter of public record prior to the reduction of Dr. Levine's courseload in May 1979 and thus the University was on notice that the enforcing agency considered that the exemption did not extend to individuals in Dr. Levine's position.
 
 
 [11]
 The record does not show whether retention of Dr. Levine would be less costly than hiring a younger employee. Although Dr. Levine's salary might be higher, the University may be relieved of paying certain fringe benefits because of his changed status. In any event, Congress clearly rejected cost as a general justification for discharge of older employees in the ADEA. Under the ADEA, it is unlawful for an employer to reduce the wage rate of any employee to make his or her employment no more expensive than that of a younger worker. 29 U.S.C. § 623(a)(3) (1976)
 
 
 [12]
 See note 8 and accompanying text supra
 
 
 [13]
 Dr. Levine does seek liquidated damages which are available only in cases of willful violations of the ADEA. 29 U.S.C. § 626(b) (1976). Because the district court did not reach the damage issue, whether the University's conduct constituted a "willful violation" is not before us
 
 
 [14]
 The University has not argued that its action was covered by the savings provision for employee benefit plans embodied in collective bargaining agreements in effect on September 1, 1977. See Age Discrimination in Employment Act Amendments of 1978, Pub.L.No.95-256, § 2(b), 92 Stat. 189
 
 
 [15]
 The University seeks to challenge the plaintiff's failure to join the Union as an allegedly indispensable party. Even if the University's motion for summary judgment were treated as a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), the University would not be precluded from asserting in its answer certain defenses such as failure to join an indispensable party or other legal defects in the claim. See Fed.R.Civ.P. 12(g) and (h). We intimate no opinion on the validity of the University's joinder claim, except to note that there is authority to the contrary. See Marshall v. Eastern Airlines, Inc., 474 F.Supp. 364 (S.D.Fla.1979); Dunlop v. Beloit College, 411 F.Supp. 398 (W.D.Wis.1976); Ostapowicz v. Johnson Bronze Co., 369 F.Supp. 522 (W.D.Pa.1973), aff'd in part and vacated in part, 541 F.2d 394 (3d Cir. 1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977)